Good morning everyone. Judge Batchelder is on the phone with us and she'll be listening to your arguments on the phone. That is why I'm sitting here. Judge Batchelder, can you hear us? Yes, I can. Okay, so there's your confirmation and please let the clerk know if you're reserving any time for rebuttal and please let me know as well. And you can call the first case. Case number 166085, United States of America, Thomas Saylor. Oral argument not to exceed 15 minutes per side. Mr. Heft for the appellant. Your Honor, may I reserve three minutes for rebuttal? Yes, but I'm going to ask you to keep your voice up. Yes, Your Honor. Thank you. May it please the court. The issue in this case is whether Mr. Saylor was in custody when he was questioned by the federal agents in the halfway house where he resided. In US v. Panic, this court identified several factors that aid in determining whether a custodial interrogation occurred. The factors include the location of the interview, the length and manner of the questioning, whether the individual is told or has unrestricted freedom of movement, and whether the individual is told that he does not have to answer questions. Mr. Saylor was on state probation and residing in the halfway house with other offenders. Now, the district judge and the magistrate judge both thought it was a close question of whether, in the words of the district judge, the halfway house was the functional equivalent of a custodial interrogation. The district judge sort of summed it up this way. He said, although Mr. Saylor's residence was unconventional, it was far less isolating and far more familiar than the police-dominated atmosphere of a station house. And that standing alone, the fact that the residence was atypical did not cut in Mr. Saylor's favor. But a halfway house is not just an atypical or unconventional residence. It's part of the Kentucky Department of Corrections, and the residents are subject to the rules and regulations not only of the individual residence, but also of the Kentucky Department of Corrections. And a violation of those rules and regulations could result in a revocation. So the residents of a halfway house don't have the same freedom of movement that a person would have in a privately owned, pardon me, privately owned... rules in terms of whether they could go out at times of their own choosing, and maybe others could only go out for work. I think as a general matter, Your Honor, you're right. There would be restrictions. But in this case, it was not developed what restrictions might have been. The conditions of probation were not introduced. We don't have any evidence affirmatively that he was not simply free to go out and go into the community. That's correct. And the other point to make is that just by knowing that they could be revoked or sent back to prison for a violation of the rules and regulations, creates an inherently coercive environment. Indeed, the magistrate judge here thought that the interrogation that occurred at the halfway house may have created a coercive environment. And there are a number of factors here that show that the environment was indeed coercive. The court's aware that the halfway house was subject to a search warrant that was executed by 10 armed federal agents. They rounded up the residents. They handcuffed them with the exception of Mr. Saylor. The agents indicated to Mr. Saylor they wanted to speak with him. He was isolated from the other residents and singled out for questioning. And it's reasonable for him to have believed that he was not free to leave at that point because an agent or an officer was stationed outside the kitchen door where the interrogation was going to occur. That person who was stationed, did he say anything? In other words, you know, stay there, I'm watching you, et cetera. I didn't think that he did, but I might have missed it. The record doesn't indicate that the officer who was stationed in the doorway said anything. But Agent Riley said that the agent was there to keep an eye on Mr. Saylor so that he wouldn't get a weapon to hurt himself or somebody else while he was in the kitchen. In the end, he did try to hurt himself with a pen. Yes, Your Honor, that's right. And the other point to make is that Agent Riley, when she saw Mr. Saylor and said the agents wanted to speak with him, she never told him that he didn't have to speak to the agents and she said she probably didn't tell him that he was free to leave. And so when you take all of those factors together, they bear a strong similarity to a stationhouse interrogation and they intensify an already coercive environment. The next factor that Panic Court discusses is the length and the manner of questioning. The interrogation here took somewhere between 15 and 30 minutes. And it was conducted by two agents in what the record shows to be a conversational tone. Now, even though the interrogation was relatively short and conducted in a conversational manner, there are other factors that establish that Mr. Saylor was in a custodial setting. I already mentioned that the interrogation that occurred in the halfway house, that Mr. Saylor had reasonable belief that he was not free to leave before the interrogation started. I'm sorry, when you said he reasonably believed he was not free to go, is that based on anything that he said or simply your analysis of the factors? It's based on the circumstances, Your Honor. He didn't say anything in particular. But then again, none of the agents ever told him that he was free to go. No, but he didn't say even afterwards like an affidavit or something that says, I did not believe I was free to go. That's correct, Your Honor. There were a couple of the other factors that would establish a custodial setting. While he was under guard there, he's waiting for the officers to begin the questioning. It took them about 15 minutes before the questioning began. But I think the most weighty factor related to the manner of interrogation is that the agents confronted Mr. Saylor with the evidence against him. Agent Keon testified that it was a common practice in child pornography cases for the agents to bring the photos or the images that are involved. And here the agents had Mr. Saylor view the images and the e-mails that contained child pornography, and they had him admit that he accessed them, downloaded them, or transmitted them. And in addition, they had him sign those documents to indicate that he did in fact send them. Now, in panic, the court recognized that confronting a defendant with the evidence against him could create a coercive atmosphere, and it would allow the agents to gain some leverage with their authority over the defendant. So the situation is the defendant sees the evidence piling up against him, and at that point a reasonable person would doubt that they're free to leave and terminate the investigation because they're expecting to be arrested. And the belief that they're not free to leave is reinforced by the fact that the agents never advised Mr. Saylor that he would not be arrested, that he didn't have to answer their questions or talk to them, that he could stop the questioning at any time, or that he could leave at any time. And so that panic factor should weigh a cut in his favor. So to the extent you rely on that, you would potentially be saying that he wasn't in custody when it started, but as they showed him more evidence, it became custodial? Does panic or any other case really say that? No. I think right from the start, once he was isolated in that kitchen and under guard, he's not free to leave. The custody starts at that point. And it just intends to. If you're right about that, then you're right. But if you're wrong about the beginning, then how much does showing him evidence turn it into custody? Is there any case that really says that? I think there certainly could be a continuum of when the custody occurs. Again, I guess the common thread running through all of the cases that are cited in the briefs of both parties is that every circumstance, every factor matters in assessing custody. So custody can occur at any point along that continuum until the interview or the interrogation is over. And if you don't have any other questions on that, Judge Boggs, I'm just going to move on to the third factor, the unrestrained, whether or not Mr. Saylor possessed the unrestrained freedom of movement. And it's true he was not handcuffed. He was not physically restrained during the interrogation. But the fact remains he was still seated at the kitchen table under guard waiting for the questioning. And, again, the fact that the agents did not advise him that he didn't have to speak with them, that he wouldn't be arrested and that he could stop the questioning, militate against a finding that he was aware that he possessed the unrestrained freedom to move. Because if he had been told those things, if he stayed and answered their questions, it would have been a much stronger indication that there was a noncustodial setting, because it would affirmatively show that his freedom of movement was indeed unrestrained. And the last panic factor is whether or not he was told that he did not have to answer questions. That factor clearly weighs in his favor because he wasn't told that. And panic recognized that whether a suspect is told that he does not have to answer questions is a particularly important factor in assessing whether or not he's in custody. And in a close case, that advice might affect the outcome. We would submit that this is such a close case. As I mentioned earlier, the judge and the magistrate judge recognized that it was a close case, at least in terms of whether the halfway house was the functional equivalent of an interrogation cell. And then you have the magistrate judge who recognized that the interrogation itself may have created a coercive environment. Add to that the fact that Mr. Saylor was not told that he would not be arrested, wouldn't have to talk, didn't have to talk to the agents or answer their questions or stop the questioning at any time and was free to leave at any time. The failure of the agents to do that has to be held against the government in assessing whether or not it was a custodial interrogation. And under the circumstances, we would submit that the panic factors, as well as all the other factors in this case, show that Mr. Saylor was in custody during the interrogation and that he should have been apprised of his Miranda rights. And we'd ask the court to vacate the judgment and remain in the case with directions to grant the motion to suppress. Thank you, Your Honor. May it please the court, Terry Cushing for the United States. Your Honor, I want to start with the last point, since it was the last point that my colleague on the other side here made, and that is that the agents did not advise Mr. Saylor that he didn't have to answer questions. The case law does not say that that is an important factor in every case. What the case law says is if that factor is present, it's important. The cases stress that law enforcement is under no obligation to give that advice if somebody isn't in custody. If somebody isn't in custody, no case prescribes what kind of advice the suspect must be given. So the fact that that is not here isn't really a factor, because the other factors show that Mr. Saylor was not in custody. What the district court found on the location of this interview was that Halfway House isn't a conventional home, but it was his home, it was his home turf, as the judge put it. And I believe he was echoing some of the case law when he made that finding. And that is correct. And even someone in their home can be placed in custody, but what we have to look at here is he was on his home turf. So now let's look at the other factors. Let's look at what happened here. In this case, the police were coming into a Halfway House where convicted criminals resided. So they did go in with force. As the case law says, it's perfectly normal, perfectly acceptable, very legal. They handcuffed everybody in the house except for Saylor. The case agent recognized Saylor before anyone else took custody of him as they did the others. So even though the original person who confronted him had his gun drawn, agent Riley, who was the case agent, did not have her gun drawn. She approached Mr. Saylor and she asked him if he would step into the kitchen. She doesn't remember whether he said okay or if he just nodded and went in. Either way, he went into the kitchen. And yes, during the time that the house was being secured, there was someone at the door. Again, perfectly fine. The fact that he was not free to leave or that no one else in the house was free to leave while they were clearing the house, is not important to the ultimate question of whether he was in custody when the interview occurred. Look, it's not a matter of whether the police conduct was reasonable in the context. I mean, the question is what a reasonable person would have thought from his standpoint. So you're already living in a halfway house. The police come in and they're looking for something of yours. Everybody is put in one place. You're isolated in a different place and isolation is a factor. They don't need to handcuff you because they have somebody at the door. So you're in that room and then they start talking to you and they start showing you the evidence that they have. And I don't know why, how would somebody in that position feel that they were free to leave? Well, whether they felt free to leave isn't the test. The test is whether they were arrested or their freedom of movement was restrained to the degree associated with formal arrest. A person who is stopped in a traffic stop is not free to leave, but they are also not in custody for purposes of Miranda because they're not arrested. And their freedom of movement isn't restrained to the point of an arrest. Mr. Saylor here was allowed to sit in the kitchen. He was allowed to move about as freely as he wanted to within the kitchen while they were clearing the house. But the most important thing is that once the house was cleared, the person who was at the door left. The two agents came in to interview him. They did not handcuff him. They did not threaten him. They did not draw their guns. They sat down and talked to him in a conversational tone. Yes, they had evidence against him, but there's no evidence in this record that they used that evidence in some way to coerce him or to overcome his will. And this statement that Mr. Saylor saw the evidence piling up against him doesn't stack up to the record. Mr. Saylor confessed almost immediately. He was very cooperative. Again, the tone was conversational. He wasn't hesitant to talk to the agents. And there was nothing to show that he was restrained in his freedom of movement once the agents came in to talk to him during the interview, which is the crucial time. He was not arrested and his freedom of movement was not restrained to the point associated with a formal arrest. So all the factors cut in favor of that he was not under arrest. With respect to the securing of the house or the people in the house when you're serving a search warrant, as I recall, there's a case, I think it's Summers v. Michigan, that says you can secure people in a house without any other cause if you're serving a search warrant. At least enough to ensure your safety. Do you recall, are those people in custody for Miranda purposes when you're just serving a search warrant? They are not. And I believe Swanson in our brief from this circuit, also, Swanson is one of this court's cases. But I think you're correct on Summers v. Michigan as well. But in Swanson, they were securing people to, actually they had an arrest warrant and then consent to search a place. And the suspect was actually, he was going to be identified before they were going to let him leave. So he was in basically a Terry stop situation where he was not free to leave initially, but once he was identified, the agent talked to him and he was, again, cooperating. He was cooperative and conversational and he was not in custody. So there are no factors here that show that Mr. Saylor was in custody. Given that he was in a halfway house to begin with, again, we have to look at this from the standpoint of a reasonable, innocent person. Which also goes to answer to your initial question, Judge White. It has to be approached from the standpoint of a reasonable, innocent person. Not someone who is guilty and knows that there's going to be evidence against them and would they feel free to leave. So here, of course, would a reasonable, innocent person be in a halfway house. And I apologize because I don't believe I cited the case in my brief. But there are cases where police go to a prison where someone is serving a sentence on one crime and they come and interview them on a different crime. And a person who is even in jail isn't in custody for Miranda purposes unless some other factors become present. So we're not talking about can the police restrain somebody for other purposes besides interviewing them before they actually interview them. So long as at the interview time, the person's freedom of movement isn't restrained to the point of arrest. So the only factor that would favor the defendant here would be that he was not advised, he didn't have to speak. But again, if we read the cases closely, that's really a non-factor. It's only a factor if other factors indicate custody and the police do in fact give that advice that you are free to leave. You don't have to answer our questions. And then that would nullify some other factors. Does it matter that his probation officer was there? Not in this situation. I suppose there could be a scenario where it would matter. But here, there's no evidence that he was even aware his probation officer was there. His probation officer testified that he didn't even see Mr. Saylor until after the agents let him know that he had confessed to these crimes. And then he called his supervisor and the supervisor told him to arrest him. Only at that point, and the interview was over at that point, did the probation officer even see Mr. Saylor. So there's no evidence that he even knew he was there. Do you think this case is comparable to panic? In some ways it certainly is. In other ways it isn't, obviously. Because I believe in panic they did advise the defendant he didn't have to speak. But we have some of the same factors in terms of other things going on before the evidence. But in panic it was a big deal that it was the woman's house. They were investigating someone else. People feel free to eject people from their homes. They feel more secure. They're not isolated from other people. How does any of that apply here? I agree, Your Honor, that those are the factors that distinguish panic from this case. But panic, we've cited it mainly for the factors that it identified that the court must look at. But the fact that Saylor was on his home turf is obviously something somewhat in common that he couldn't eject. To tell the police to leave probably would be a distinguishing factor. But he was at least on his home turf. The fact that we cited panic is more for the factors than for the similarities of the facts. So no, we don't believe that it's on all fours with panic in any way. What's your best case for similar circumstances? Probably Swanson. Berkamer, again, would have some similarities in that there was a stop for another reason. I'm sorry I'm not coming up with a search warrant case that I should. Are there any cases with respect to a halfway house that you know of? I mean, you did cite a case about even an actual prison if you're investigating a different crime. That would sort of go your way, but are there any that talk about a non-prison but non-private house? No, Judge, we did not find anything in our research about a halfway house, and I don't believe my colleague on the other side cited anything. So this may be a case of first impression. There were a lot of factors, and I think the district court here got it right. This was the defendant's home turf, and so that made it not the coercive atmosphere of the station house. And, of course, there are cases that even taking someone to the station house isn't an absolute as far as custody goes. But here he was on his home turf, and the way he was treated would leave a reasonable person with the impression that they didn't have to answer questions. They wouldn't have felt like they had been arrested, based on all the factors in this case. If the court doesn't have any other questions, we ask the court to take a close look at the magistrate judge's findings of fact. Take a close look at the magistrate judge's findings of fact and conclusions of law and the district court's order on this case. They're both very well reasoned and look very closely at the facts. I know this is a de novo case, but those are certainly persuasive orders from two judges who looked very closely at this. And we ask the court to affirm the district court. Thank you. Judge Batchel, do you have any questions? I do not. Thank you. Your Honor, I'd just like to make several points on rebuttal. First of all, with respect to the importance of not advising Mr. Saylor that he didn't have to speak to the agents, panic itself says that is a very important factor in the analysis. That can be found on pages 467 and 468 of that panic decision. With respect to the government's argument about the Swanson case, on page 530 of that decision, the court notes that it's most important that the defendant was told by the police or the officers or whatever that he was not under arrest and did not have to speak to them. Again, I think that's a huge factual distinction between this case and Swanson. The government also argued that the test is what a reasonable innocent person, how a reasonable innocent person would view the situation. And I respectfully submit that that is not the test. I understand this court in Galloway said it was supposed to be from the perspective of an innocent reasonable person. But that rule is grounded in the Supreme Court decisions in Burkhammer and Stansbury v. California. And they talk about it in terms of a reasonable person in the defendant's situation or the defendant's shoes. It doesn't say anything about that reasonable person's guilt or innocence. So I think that to the extent that the government argues that a reasonable, you look at it from an innocent person, is inconsistent with both Burkhammer and Stansbury. And the last point that I want to make is with respect to Judge White. You asked whether or not it mattered that the probation officer was there. I think it did matter. The FBI agents said their policy is not to arrest individuals in child pornography cases unless there's some imminent danger. And that was not the case here. But the probation officer was advised of the search as a courtesy. And the officers had to know that if Mr. Saylor made some kind of incriminating statement, there's somebody out there who could arrest him immediately, the probation officer. Well, the agents could have arrested him. I mean, that's just a matter of policy. You're looking at that from the agent's side. Your adversary said he didn't know of the probation officer's presence. Do you dispute that part? No, there's no indication in the record that he knew the probation officer was there. But my point is the probation officer is waiting in the wings, and even if the FBI wasn't going to arrest him, an arrest could be made for either a violation of probation or a new state offense. And if there are no other questions, Your Honor, I would again ask the Court to vacate the judgment. Thank you.